No. 172079, the Financial Oversight and Management Board for Puerto Rico et al. v. the Ad Hoc Group of PREPA Bondholders et al. PREPA. Thank you. No, I'm fine. I could go all day. Thank you. May it please the Court. Thomas Moores, Mayor of Kramer, Leatherneft, Hallis, and Frankel. Today, on behalf of holders and insurers of bonds issued by the Puerto Rico Electric Power Authority, I would like to reserve five minutes for rebuttal. How many do you want? Five. Five. Okay. Thank you. Now, what if I hold you to strict rebuttal? What are you going to do then? No, I'm kidding. Go ahead. Figure it out in the time coming. Your Honor, this Court in Piaget ruled that the stake must be lifted for lack of adequate protection. In this case, the Court below ruled that the stake can never be lifted for adequate protection. We submit that the Court below was wrong as a matter of law. The Court below relied on two sections that on their face had nothing to do with lifting the stake or with adequate protection. The first is Section 305, which is a limitation on the power of the Court. It is not a limitation on the rights of parties. It says, notwithstanding any power of the Court, the Court cannot enter an order that affects the property of PREPA. We are not asking the Court to enter an order that says in any decreal paragraph, PREPA must do something. The Federal Oversight Board must do something. We are not asking for any of that. We are asking for relief from the stay, which is an order administering the statute that gives the Title III Court its power. You want relief from the stay to protect your collateral. That is correct. I'm having some difficulty quite understanding what the collateral is here. Some of the briefing has maybe assumed things that... What is... I understand that there is nothing in the special account. Your Honor, I don't know if there is nothing in the trustee's accounts. There is an infinite stream of revenues that is pledged to us. How do you have collateral in... When I think of collateral or security interest, I usually think of it gives the creditor some rights vis-à-vis third parties who might receive that property from the debtor. So, if I have a mortgage, I hold a mortgage on your house and you try to sell it to a third party, they are stuck. Or if people have notice or implied notice. I don't see how that fits this situation. They've got a promise. You've got a promise from them that they'll put certain money in an account. But if they breach that promise, how have you got more than an action for breach of contract? Because, Your Honor, every municipal revenue bond that has ever been issued involves a pledge of periodic revenues. And a pledge is a promise to pay. No, Your Honor. A pledge is a collateral instrument. And it is recognized as such in the Bankruptcy Code. And it is recognized as such in the Uniform Commercial Code. And it is recognized as such under the statutes in Puerto Rico. It is not merely, I promise I will pay you. It is a statement that when I collect revenues, you have a pledge on it. You have a security interest on it. Does that protect you vis-à-vis third parties? Yes, we do not believe they could sell the revenues going forward without our being following those proceeds. The revenue isn't attached to the proceeds, yes. And so you have a right now, if they spent any of those revenues other than putting them into the trustee account, you could go after all the third parties that received that money? We have not found it necessary to do that. But actually we have filed a proof of claim in cases other than PREPAs under Rule 3000, Bankruptcy Rule 3001, E3 and E4, and said, wait a minute, the money that is due from Highway is our collateral. You should pay that to us. We have an interest in the receivable that is due from the Puerto Rico Highway and Transit Authority to PREPA because we have a pledge of revenues and a pledge of revenues is the same pledge of an infinite stream of accounts receivable. Aren't these classified as special revenues? Yes. And so there are specific statutory provisions for dealing with special revenues, including the application of special revenues to the debt is not interfered with by the state? That is correct. That is Section 922D. So isn't that your form of relief here? But isn't 928 sort of the trump on that because you have to pay the necessary operating expenses, so by the time you end up paying the expenses there is nothing left? No, you are correct that 922D provides for the payment of revenues to bondholders, notwithstanding the application of the automatic stay, and you are correct that necessary operating expenses come out first to observations. None either of these issues was argued or briefed below because the essence of our argument is that the total amount of revenues should be greater than it is today and frankly the total expenses should be less. Do you have a situation where net revenues are diminished because PREPA simply won't collect what it is owed? That is a denial of adequate protection and indeed it interferes with our rights under 922D and under 928. But 922D and 928 were not argued below and the court did not deal with them in this opinion. And I understand that but I think sometimes in these cases going forward it would be helpful if the parties understood a lot of this is brand new, sui generis, and then we are referring to bankruptcy procedures almost but not quite 100% and there are these differences. It would be very helpful in these cases if the parties would put things in context of how the overall, their view of how the overall thing should work before you get down to the nitty gritty. And I think that is what we are trying to get at here. And back to the question of the collateral, I mean if you don't have a right because the money can go to the necessary operating expenses to all of the money in the fund and if the allegation is there is no money in the fund, then what is your collateral? Well, first as a technical matter, as of August, whether or not there was money in the fund was a disputed fact. If you take a look at the joint appendix in Volume 3 at 1821, you will see a supplemental affidavit which says, gee, based on the Puerto Rico Energy Commission you should have 593 million of net revenues. Where is it? And since you asked for the broader context which is beyond the scope of what the court below actually held, shortly before the hearing we actually filed a section 922D complaint and said where is our money? All of that got put on hold by the hurricanes. It is one of the reasons why we asked for a remand and one of the reasons why the argument by the oversight board that you take a snapshot at one moment in time and say an infinite stream of revenues is worth zero because look at what the revenues are at this particular date. Doesn't that cut exactly against you though? Because if things turn around, then the revenues will be there. And if things turn around, we would expect to get those revenues, but in the meantime, if PREPA has the ability to raise rates and if it has the ability to collect what it is already owed, and since what it is already owed, approximately $200 million of it is from its fellow governmental agencies, then its failure to do either of those things denies us adequate protection and the argument just wait until the end of the case because everything will come out alright, that was an argument that worked in your Piaget decision because that was an argument that was made by the obligors. They said you don't have to decide that today if the revenues will be there to pay these people off in the fullness of time. But that's not what happened here. In a broader context, what happened here is that we spent two to three years negotiating a deal that would have paid us 85 cents on a dollar. The Oversight Board came in, ripped it up. When we moved for adequate protection, they said your collateral is worth nothing. And not only is it worth nothing, it's getting worse. And we at the Oversight Board are not going to do anything about it. Let's go back to what's the collateral here in 922D and follow up then on your response to Judge Torsen's question about 928. If we simply said go forward under 922, 928, I gather you'd essentially get nothing because they would claim all the revenues that they have now are going to their operating expenses. As of this moment in time, I'm sure the Oversight Board would claim that and have a nice dispute which would be a factual dispute as to whether the operating expenses they are deducting from our collateral are necessary operating expenses. Let's assume you get into that box without conceding anything and they say, Aha, as I understood one of your answers to Judge Torsen, you then said, that's one of the reasons why we want a receiver and then relief that makes them raise their rates. And collect their debts. Now that, that interest, that really sounds like a contractual government, that particular right that you have under the contract to require them to raise rates. How is that collateral? It is collateral for three reasons. First, it is not just under the contract, it is under Puerto Rican statute. And second, under the Constitution of the United States, there is an obligation not to set rates at a confiscatory level. Well, the Constitution protects contracts, so the fact that this is protected under the contract doesn't mean it's collateral. No, with respect, Your Honor, that protection that I am referring to is not a protection under the contract laws. It is a protection under the 5th and 14th Amendments. I reserved my time for a while. Oh, gosh, there are so many more questions. Don't make me keep them all day, if you want. Good morning. May it please the Court, my name is Martin Biedenstock with Pascal Ruiz, LLP. We represent the Financial Oversight and Management Board for Puerto Rico as the Title III representative of the Puerto Rico Electric Power Authority. My first point, Your Honors, is that the District Court did not abuse its discretion in denying state relief to protect its jurisdiction and the Title III restructuring process, just as, many years ago, the United States Supreme Court in Connell, Illinois, Bank v. Chicago Railway affirmed an injunction against the enforcement of collateral claims in a case already 17 months old. But did the Court really do that here? It seems like the Court's opinion really essentially concluded that under 305 and 306, it couldn't do anything. And then it has a paragraph where it sort of refers to one side of some of the Sonex questions. Your Honor, I beg to differ, at least slightly. The Court does spend a lot of time on 305 and 306, and I'll get to that. But in addition to doing that, that's on page 1919 of the appendix, where the Court makes that fairly categorical statement about 305. But then, two pages later in Judge Swain's decision, at pages 1921 and then a second time on page 1923, Judge Swain said, in the first instance, the same considerations of locus of control during the Title III process lead the Court to conclude that the balance of harms weighs heavily against the grant of state relief here, to the extent the Court has any power to grant such relief. But there's no reference there at all to what the collateral... How could you do a balancing that's required under the statute, assuming 305 doesn't control, if you don't even identify what the collateral is? Well, the Court did a very careful balancing, and basically this is how the Court did it. First, the Court looked at what was the ask, contrary to my opponent's statement that the Court ruled under 305 that there can never be state relief in a Title III case. It's not what the Court did. First, it very carefully asked a narrow question. And the question was, can I grant state relief given 305 to change management and push up the rates? And the Court went to great pains to quote the full receivership statute, saying that if she grants the state relief, the receiver gets to move in, kick out the board, kick out officers, kick out employees, do all things in the name of PREPA, and do whatever rate heights it wants. That's the ask. This was not, give me some type of conditional state relief or give me some relief that will move the ball in some direction. This was, turn over the case to a receivership court. Against that, the Court then balanced all of the things that she would be destroying if she did that. And she took them off very carefully in her opinion. It's probably nearly half the pages of her opinion on the discussion part. She said, well, number one, if I put all the revenues in the hands of the creditors, now how is the oversight board going to propose a plan of adjustment? How can you propose treatment of creditors when someone else is holding all the money? Two, the oversight board, which is not only the Title III representative for PREPA, but is the Title III representative for the Commonwealth and all the other debtors, and has independent duties in its own right, has to do fiscal plans and budgets for each covered entity of which PREPA is one. And they all have to work together to turn around negative economic growth. How is the oversight board going to perform that function if I give the most critical entity in the Commonwealth, which is the producer of power, the monopolist producer of power, over to the creditors? The cost of power matters. You don't have to be an expert to know that if you've already had negative economic growth, and Congress in Section 405M1, 2, and 3 of PROMESA gives this court and the trial court findings to start with, fiscal emergency, inability to provide effective services, and accelerated out migration, how is the oversight board going to do its job to turn all that around to create a sustainable economy if I put the cost of power in the hands of someone else? So that's a grievous harm, the plan. Now, how are they going to manage? The receiver gets to throw out all the existing management. So neither the Commonwealth government nor the oversight board would have any way of managing PREPA. So what about the other side of the equation? In other words, you've listed all of the reasons and harms that were caused. And there are more than that. Judge Swinton is very thorough on that. What about the other side of the balancing? Right. And the court gives the creditors full credit. Full credit. She says, yes, if I do this, they're not going to get money until we deal with the plan, unless there's some interim agreement that gives them money. Or, as Your Honor suggested, if things do get better, maybe there will be a positive difference, and then they will have money in the account. So what the court said was, I grant you that you're not going to have money between now and confirmation, when we see if the plan of adjustment treats all your claims, whatever your collateral claims are, if they include the rape covenant, the receivership remedy or not, unless that plan of adjustment treats you in a confirmable way. It can't be confirmed. So between now and then, you may not get paid, just as the creditors in Connell, Illinois were not paid. She said, but I'm balancing that. You're delaying payment. And by the way, they say to Your Honors in the reply brief that they're fully secured. They said it, the lawyer said it at the oral argument to Judge Swain, they're fully secured. So you say they're fully secured, I'm delaying payment until plan confirmation time. But by doing that, I'm allowing the full Title III restructuring process and everything the Financial Oversight Board is supposed to do for Puerto Rico to take place. Now, what if I did the reverse? I give you the electric utility to the creditors, and now the Financial Oversight Board can't do its job? And we can't restructure because you have all the revenues? And sure, you might apply for a rate hike to get you paid in full, but in the short term, people can't move out overnight. So in the short term, maybe you'll take in a bundle of money? But if that accelerates the out-migration, then where are we? How can we turn things around? This is a magnitudinous problem, and the judge is saying, give me from now until confirmation, because the process needs that time. And it's not as if the money is being used for any improper purpose. We know they claim mismanagement. They admit there was a restructuring officer there for three years that made a lot of positive changes. There's no indication those changes have been turned around. But it's not as if the Commonwealth is taking dividends. As a practical matter, after the hurricane, it's just the opposite, because it needed more money. But that's not in this record. So I think the court did, you can call it a big-picture balancing. But now let's look at what would happen if there were further evidentiary hearing. Because the creditors say they're brief. They say, what are we going to do after hearing? We're going to cross-examine Dr. Wolf to show that his opinion that raising prices would cut off the return to economic growth is not a valid opinion. They don't say anything about what they will prove. Their declarations from Mr. Spencer and Mr. Hansbrook say, oh, there was a settlement that the oversight board didn't approve. That's totally irrelevant. That we think there's mismanagement. Well, everyone's been working on that. That's their case. So I think the judge was in the perfect position. And the judge carefully said at the beginning of her opinion, I'm taking my facts from the Moobin's motion. She didn't take any of our facts. So then are you saying that to the extent that we have difficulty understanding what the collateral even is categorically and how that would be balanced, because we just don't see it in the opinion that the fault lies with the Moobin's, because they have the obligation to identify it? Well, I would buy into the fault, but I would probably articulate it a little differently. They admit that the net revenues are zero. They even say in the brief to this court that the revenues barely cover the expenses. So what other collateral is there? They point to two things. A receivership remedy and a covenant to raise rates. It's no mystery. Now, we take the position that a remedy is not collateral and a promise to raise rates is not collateral. But your honors are perfectly free in deciding this to assume in their direction. Assume it is. It doesn't change anything. Giving the relief they asked is so onerous, so destructive of the entire Pomesa and Title III process that the court's balancing comes out the same way. And that's probably why Judge Swain didn't bite on our attack on what they were claiming as collateral. Can I ask on the, on Judge, I know this is kind of going back to what we were arguing about before, earlier, but this whole idea that Judge Swain has that she is basically has to do the, I'm calling it the OB, the oversight board's bidding and she can't touch any of the revenues. Could she ever protect a secured creditor who is not adequately protected if the oversight board didn't consent? Is that completely outside her power? And then the question is what is she even there for? First, Judge Swain has denied the oversight board request in this case and any observer on the ground knows that this is hardly a situation where she defers to the board. She always has a careful hearing and weighs all the issues and the facts. In terms of your question, Your Honor's question about I'm talking under 305, though. It seems like she thinks that if she touches any of the revenues then without the board's consent, then her hands are tied. She can't issue an order that in any way impacts that. Okay, so 305 does say directly that the court does not have power to interfere with the revenues of the debtor. It's the same in Chapter 9. It was the same in Detroit, same in Stockton, and on and on. Well, it looks like some courts take that pretty seriously. They do take it seriously, but what the court can say and what Judge Swain said is I can dismiss this case. If I think, you know, she didn't say it this way, but if she, for whatever reasons, if she thinks that a party's Fifth Amendment rights are being permanently violated as opposed to temporarily stayed while we get to confirmation, she can dismiss the case. And she says outright, she spends a page on it in this opinion. Thus, dismiss the case. If 305 doesn't apply, you can get your receiver and go to town. Now, can she micromanage as judges in Chapter 11 cases can do and order the debtors how to do their business? No. Congress purposefully did not put Section 363 of the bankruptcy code in Chapter 9 or in Title 3 of PROMESA. So her leverage is essentially that I'm out of here. It's dismissed. And frankly, that's the relief that the move-in's asked for. Turning over the physical plant, the control, the management, the employees, and the powers to them of the only asset we have is I'm out of here. And that's what Jefferson County said and that's what Judge Swain alluded to or she referred to it directly as I have exclusive jurisdiction, but if I only have this relief, I basically have nothing. And they disagree with that. And they say, oh, we're just going to have a receiver in there. You go do what you're doing. Well, that's impossible. They're controlling all the money, have all the power to make decisions on rate hikes and everything else. It's impossible to do what Congress foresaw would be done. So what does it look like? What's the scenario at the end that protects what they asserted their property interests? There are two things going on. Assume it's not a consent scenario. It's a confirmed plan. Okay. It's been publicly disclosed that the oversight board and the government are looking for a transformation of PREPA so that it will probably rely on a different type of fuel rather than fossil fuel, natural gas or something else, something with less priced volatility, et cetera. It will bring down costs, hopefully increase profits, they want to accomplish that, and all of this, hopefully, is going to be in moving to benefit. We don't treat them as the enemy. We're fighting here, but we don't treat them as the enemy. I'm still trying to get dollars and cents. At the end, is the scenario that they have to hope for is there'll be a plan that will start the flow of money going into the special account to the benefit of the bondholders? Of course. And that's what we all want, is that type of plan. And if it's on a transformation, it may be radically better than things are now. Or not. May I have one minute? Yes, of course. In their reply brief, they cite three cases, Cassidy, Memorial Estates, and Kellogg Tax. Say, look at these. Bankruptcy. Chapter 9 courts appoint receivers. Chapter 11 courts appoint receivers all the time. Wrong. In Cassidy, the debtor was suing out, wanted a receiver against someone else. In Memorial Estates, the Chapter 11 trustee was okay with allowing the appointment of a receiver, but Judge Posner said, if the Chapter 11 trustee had not been okay, this would have been abuse of discretion. And in Kellogg Tax, they did not allow the appointment of a receiver for a company that was not property of the estate that might turn into property of the estate. It was in the litigation. There's no basis to say there's jurisprudence out there saying that notwithstanding 105B, that it's fine for Chapter 9 or Title III courts to appoint receivers. Thank you. In rebuttal first, my opponent says that our receiver can install any rate heights it wants. That is not true. The most it can do is initiate a petition before the one entity that actually has jurisdiction over rates, and that's the Puerto Rico Energy Commission. The Oversight Board has no role in setting rates. 1129A6 of the Bankruptcy Code which is incorporated indicates as much. That's number one. Number two, the preparation which is effectively adopted by the court below that this will remove control of PREPA from the Oversight Board and deliver it to creditors. As we pointed out, a receiver is not the creditor's tool, it's the court's tool. And finally, the Oversight Board has no power to manage PREPA, it's job. A receiver will be subject to the fiscal plan. It will be subject to the budget. The receiver replaces the board of PREPA and remains subject to all of the powers of the Oversight Board. There is nothing the opponent of the receiver does that prevents the Oversight Board from doing its job. And with respect to jurisdiction, if there turned out to be any of the horribles I submit is justified. So that sounds like it wouldn't help you then. No, because... Because suppose the board says for all the reasons we just heard and Judge Swain detailed and many of which are quite obvious and are worse than when she detailed them, the Oversight Board would presumably say don't raise rates now. Yes, but the Oversight Board... Would you agree that... The Oversight Board, with respect, it has the power to propose a budget, to set or downcheck rates itself or at least that is a hotly debated point. So I think you've now said that she's right, that the Oversight Board wouldn't be able to keep them from raising the rates. The Oversight Board, in our view, would not be able to prevent the Puerto Rico Energy Commission, which is established for the purpose of determining what rates are from raising rates. Indeed, the Johnson Act suggests that a federal court has no business telling a state utility commission what rates to set. But isn't there a statute that would require that commission to raise rates to whatever level is necessary to pay the bondholders? The statute does provide that and the Energy Commission will take that into consideration. So if they do that, then the whole parade of horribles that concerned Judge Swain would come to bear. I don't think so, Your Honor, because the parade of horribles was not that raising rates will be terrible for the Commonwealth, which incidentally is not PREPA, or even that raising rates would be terrible for PREPA. Your Honor, things may or may not have changed since the hurricane. You are in a larger picture. The $300 million emergency loan that Mr. Beanstalk refers to in his papers has been paid back 50 percent and PREPA is sitting on $300 million approximately in cash in its accounts. What things will be like when things are remanded, I don't know. But to assume that there's nothing in the account which was not a fact found below, and to assume that there are net revenues which was not issues litigated below, I submit is not proper. In terms of the parade of horribles, Judge Swain will be able to make findings of fact as to whether or not those are actually real, rather than just assuming that the replacement of a politicized board of PREPA with a court-appointed receiver is ipso facto a parade of horribles too awful to contemplate when none of the powers of the other side are actually diminished by the change. If we were to hold that 305 doesn't prevent the judge from letting other courts do something that the federal court could not do, that would only get you then to your claim that there wasn't enough balancing and we should remand to undertake the relief from state balancing? That is correct with one small amendment. But why couldn't you do that again anyhow under changed circumstances? Why couldn't you file a new motion? No matter how we, if we say no, she was wrong on 305, but the balancing she made in her order of September of 2017 we find within her discretion, why would that preclude you from filing in the summer of 2018 under changed conditions a new request? Two answers to that question. First, her opinion recites the displacement of PREPA's politically appointed management with a receiver as in and of itself sufficient to deny relief from state if I may continue. And that would stand as a bar to any future action. And I had a second point that has slipped my mind. If I understood you correctly to say that the receiver would be subject to the Commonwealth Rate Setting Board's authority in terms of the ability to raise rates, what is the authority for the proposition that the receiver is in fact subject to the Rate Setting Board's authority? Because the only authority the receiver has is the authority to manage PREPA. And the receiver actually is subject to Act 57. It was passed after the receivership statute was passed. It's not my experience with receiverships. Regardless of state regulatory authority, I confess I do not know a precedent one way or the other under Puerto Rican law, but you are in the Joint Appendix in several places. There is a Puerto Rican Energy Commission Rate Setting Board that is set forth at length. It goes 70 or 80 pages. It is based on voluminous testimony. It is not easy to put together a rate order. You don't have a receiver come in and write a one-page order that says everybody pays more in rates. It doesn't work that way. It can't work that way. It's more complicated. I think what I was getting at is that in establishing the receivership or asking the state court to establish the receivership, that you were going to voluntarily limit the authority of the receiver to subject them to the Rate Setting Board's power. It had never occurred to me that the receiver would not be subject to the Energy Commission. I really had not considered that even as a possibility. I have lots of additional questions, but I'm going to keep them to myself. Thank you very much.